(Lorain County, Common Pleas—Oct. Term, 1896.)

### CLEVELAND LORAIN & WHEELING RY. CO. v. JAMES REID.

---

*Land Contract—Record not necessary between the parties.*

The execution of a contract being proved or admitted, the effect to be given thereto does not in any manner depend upon it being recorded. A contract for the sale of land or an agreement for an interest in lands, as between the original parties thereto, is effectual without record. In such case, equity regards that as done which ought to be done, and where an agreement of that kind is made, a court proceeding upon principles of equity will carry it into effect according to the intention of the parties.

*Land Contract—Intermediate conflicting deeds—*

Where a deed is given, in pursuance of a land contract. it is presumed to secure and perpetuate all rights conferred by the contract, and an intermediate conflicting deed given by the same grantor has no priority.

*Merger—Definition.*

Merger is not an equity doctrine. A leading feature of the law is that merger will never be presumed against the equities of the parties. To work a merger which shall have such effect, there must be an unequivocal act of the party to be injuriously affected by it, absolutely and irrevocably establishing the right to be merged.

*Record of law in wrong book—Mistake of Recorder.*

Where a lease is not recorded in the book of leases, but it is recorded in a public record entitled "Miscellaneous Records," kept in the recorders' office, the fact that the recorder recorded it by mistake, possibly, in a volume entitled "Miscellaneous Records," instead of the volume of leases, ought not to have the effect of excluding it from consideration as evidence in a case between the parties.

*Owner permitting R. R. to be built on his land—Acquiescence.*

The owner of land who stands by, without objection and sees a public railroad constructed over it, cannot, after the road is completed, or large expenditures have been made thereon upon the faith of his apparent acquiescence, reclaim the land, or enjoin its use by the railroad company. In such case there can only remain to the owner a right of compensation, and where the terms of a grant of right of way are general and indefinite, its location and use by the grantee, acquiesced in by the grantor, will have the same legal effect as if it had been duly described in the terms of the grant.

[COPYRIGHT, 1897, BY CARL G. JAHN.]

*Estoppel in pais--Definition.*

The estoppel consists in holding for truth a representation acted upon, when the person who made it, or his privies, seek to deny its truth and deprive the party who acted upon it from the benefits obtained. To work an estoppel there must be prejudice to the party claiming it, and also fraud or bad faith, or their equivalent, gross negligence, in the party to be estopped.

*Former adjudication.*

To make the defense of former adjudication available, it must be made to appear that the subject-matter of the action, and that the parties are the same. The question is not what the court might have decided in the former action, but what the court did, in fact, decide, as shown by the record.

*Stale equity—Length of time not test of staleness.*—Rules of stale equity not applicable to this case.

---

KOHLER, J.

In the examination of this case, I have been materially aided by the able oral and written arguments furnished to the court, by the respective counsel. I think it is due to them that in disposing of the case, I should not only state the conclusion and judgment of the court, but also the grounds upon which that judgment is predicated.

Within the brief period of time since the cause was finally submitted I have endeavored to review all of the testimony, not only that given by witnesses upon the witness stand, but that contained in the numerous depositions, contracts, leases, deeds, plats and exhibits, in order to arrive at the right and justice of this case, and within the rules of law applicable thereto.

The Cleveland, Lorain and Wheeling Railroad Company files its petition under section 5779, of the Revised Statutes, and the case stated is what is commonly called a petition to quiet title, and the petition is in the short form usual in such actions. It states that it is the owner of and in possession of certain real estate situated in the township of Black River, city of Lorain. Ohio, and being part of lot four, in great lot number one. It then described by metes and bounds, four several parcels, designated as Tract A, Tract B, Tract C and Tract D, and charges generally that the defendants claim an estate or interest therein adverse to the plaintiff's right, namely: that the defendants claim to be the owners of the undivided half of the said premises in common. The prayer of the petition is, that the defendants may be compelled to show such interest or estate, and that the same may be adjudged to be null and void.

To this petition James M. Reid and C. C. Reid, on the 1st of August, 1895, filed a joint answer, in which they, briefly, admit that they claim an interest in the premises set forth in the petition, adverse to the plaintiff, and generally they deny each and every other averment in the petition.

Major George C. Reid, an officer in the Navy, and a non-resident of the state, was not personally served with process, but appeared in court and filed his separate answer on the 6th day of January, 1897, in which he sets forth, as his first defense, the same claim as stated in the answer of his co-defendants. And in the second defense he sets forth that for more than twelve years, the railroad company, under a lease which was made in 1883, was a lessee of the said defendants, of the premises in controversy; and that it paid the rent thereon, without denial or controversy as to the extent of the premises embraced in said lease, and that not until July, 1895, did it claim to own the premises described in the petition; that the only object sought by the action is to procure a construction and decision of the court as to the ownership of the plaintiff, under these facts, and that there are not sufficient facts to constitute a cause of action.

In the third defense the defendant avers that on the 2nd of July,

1895, the plaintiff refused to admit its liability to pay rent upon the premises described in the lease before mentioned, claimed to be itself the owner of more than twelve acres out of the thirty acres embraced in the description of said lease, and that it was not liable to pay rent on the same.

That on the 9th day of July, 1895, the defendants brought suit in the court of common pleas of Cuyahoga county, against the plaintiff, to recover rent claimed by them to be due under said lease from plaintiff, and that process of summons as served therein against the defendants, before this action was commenced against this defendant, and that the plaintiff in this case has appeared and answered in said cause, and by its answer, among other defenses, has raised for determination, the right which it seeks to have declared in its favor in this action.

The defendant therefore claims that the plaintiff should be barred from proceeding further against the defendants.

The plaintiff has filed a reply to the second and fourth ground of defense in the separate answer of Major Reid, in which it admits the commencement of the action in the Cuyahoga common pleas on the 9th of July, 1895, against the plaintiff, and that said action is still pending and undetermined; that the plaintiff has appeared therein and answered, raising for determination in one of its defenses therein, its right to the property in its petition herein described. It avers, however, that the present action in this court was pending prior to and at the time of the commencement of said action in Cuyahoga county, and that therefore the court of common pleas of Cuyahoga county has no jurisdiction in the premises. That these facts as to the priority of this action have been set forth and pleaded by the defendant in its first answer to said action.

In further reply, plaintiff avers that the lease mentioned in defendant's answer has nothing whatever to do with, and is in no wise connected with the rights of the plaintiff, or the ownership of the property described in its petition; that the plaintiff, and those under whom it claims, was the owner and in full, open, adverse possession of the premises claimed for more than twelve years before the execution of said lease, and for more than twenty-one years before the commencement of this action; that it, nor any person under whom it claims, is not, and never was the tenant of said defendants as to said premises, and never paid any rent therefor to said defendants.

The reply further avers that at the time of the execution of said leases mentioned in the answer of Major Reid, it was and had been for a long time the owner and was in the undisputed and exclusive possession of the lands described in the petition, of which fact the defendants had full knowledge; that if said lands are included in said lease, without reserving the rights of the plaintiff, the same was done by a mistake by the party who drew said lease, and if such should appear, it asks that the same may be reformed by correcting said description, and by inserting therein a true description of the premises so leased; and for judgment as in the petition demanded.

These allegations contained in the petition, answer and reply give a very imperfect idea of the facts and circumstances relating to the case.

From the testimony adduced, substantially the following facts were made to appear. In 1871 and prior thereto, the town of Lorain at the mouth of the Black river, then called Charlestown was comparatively an unimportant village, containing a few hundred inhabitants; it was a lake port, but there was no railroad there, and no opportunity to develop its natural resources. A railroad had previously been constructed from the town of Grafton in Lorain county, south-easterly to the Ohio coal fields, and a number of gentlemen of Cleveland, engaged in the construction of

railroads, evidently desired to extend this road to the lake from Grafton, but as appears, this could not be done under the charter granted to the Lake Shore & Tuscarawas Valley Road.    Mr. E. B. Thomas, Judge Tyler and Mr. Dennis, therefore projected a railway from Black river southeasterly to the Ohio coal fields.    They undertook to build what was afterwards known as the Elyria & Black River Railway Company, but before any charter was obtained, these three gentlemen visited the town of Lorain to see what encouragements they could get, in the way of material assistance towards the construction of a railroad, from citizens of that town, and what they sought was donations in the way of lands or lots in that place, in order to promote the building of such a road.    It is to be presumed that at that time there were few at that place who had money to subscribe.

Conrad Reid, the ancestor of the defendants, was then in full life. He was the owner of considerable tracts of land at that place, including the several tracts of land involved in this case, and described in the petition.    He was the proprietor of the hotel at that place at the time.    It appears that so far as this land is concerned, which amounts now to about thirty acres in extent, that a portion of it, at least perhaps one-third, was low, marshy land, bordering upon the river at the northerly end of the tract, that possessed but very little value, unless drained or filled up.    Towards the neighborhood of the location where what is known as the pocket docks now are, there was something of a bluff.

It is apparent that the people of that town were exceedingly anxious to secure a railroad connection to the end that the town might be built up, and that the advantages of the river at that point as a harbor and lake port might be developed, thus enhancing in value and promoting the business of the residents and property owners; and when Thomas, Tyler and Dennis came to Lorain with this purpose in view, among others, they saw Mr. Conrad Reid, and from the testimony, it would appear that he was a judicious, progressive man, and not only anxious to encourage the building of a railroad from Black river south to the coal fields, but that he was willing out of his lands, of which he was then seized in fee simple at that place, to make a substantial donation.

To this end Tyler, Dennis and Thomas entered into a contract with him in writing, under the date of the May 30th, 1871.

In this contract, which appears to have been drawn with considerable care, Conrad Reid, for the purpose of aiding in the construction of the railroad, from some point on the westerly bank of Black river in the county of Lorain, to extend in a southerly direction, under the ownership of one or more companies to the coal lands in the county of Medina, Wayne or Tuscarawas, agreed to give and convey in fee simple a tract of land described in said contract, being the one undivided half part in common of the whole lot number four in great lot number one, containing one hundred and ten acres; also the one undivided half of the northerly half of lot one with the exception of four acres in a square form, bounded by certain streets, and excepting also certain small tracts that had been theretofore conveyed by deed of warranty.    And he also agreed to give and convey to the extent of his interest to the second party, in consideration of the premises, the right of way for tracts, switches and depot grounds, for the purposes of road over and through the afore-mentioned and all other lands owned by him.    It was provided as a condition, that the work should be commenced within six months from that date, and the iron rails should be laid from or near coal lands in some one of the counties above specified, to a point on the westerly bank of Black river, within three years from that date.    The contract recited that the party of the first part desired the construction of such a railroad, and it is also

stated that these rights, grants and privileges to own, use and occupy the lands above mentioned, were for the purposes of such a railroad, and in consideration of the benefits and advantages to be derived to his, Reid's property and business from the construction of such a road.

This contract was signed by all the parties, and on the 3rd day of August, 1883, at 10 A. M. it was received for record, and recorded August 14, 1883, by W. E. Cahoon, recorder of the county.

The original of this contract remained with the party of the second part or their successors, the railroad company, and it is said that this original has not been found; in some manner, it has been lost or mislaid, and the only evidence before the court of the existence of this contract, was the certificate of the recorder to the effect that the original was recorded in the Miscellaneous Records of the county at the time stated.

It was conceded upon the trial that the plaintiff in this case is the lawful successor of all the rights and interests acquired by Thomas, Tyler and Dennis.

It appears that shortly after the date of this contract, the Elyria and Black River Railroad Company was incorporated, and in fact built the road; there were sundry mesne conveyances thereafter, but for the purposes of this trial, these need not be mentioned, as it was fully agreed upon the trial, that the present plaintiff stands in the shoes of the parties of the second part under this contract of May 30th, 1871, and is now the rightful owner of all the rights possessed and acquired by the second parties under and by virtue of the terms of that agreement.

It appears further, that immediately after the date of this contract the work of constructing this railroad began, and the same was pushed to completion within the time stated in the contract, namely: within the three years, and that so far as the conditions of the contract are concerned, they have been substantially complied with by the parties of the second part, their successors and assigns.

According to the testimony of Mr. Streator, the engineer, Mr. Kinney and several others that I need not mention, the lines were surveyed for main track, and all the switches including those along the river front, and also those called the Grove tracks before 1874. The tracts of land described in the petition substantially comprise the main track and the various switches and sidings shown by the plat and such necessary adjacent space as may be reasonably necessary for the movement of trains and the business of the road.

During the time that these surveys for the main track and all these switches over all this ground were being made, the ties put down and the tracks laid thereon, Conrad Reid the ancestor, was a resident of the town. He lived at his hotel where these engineers also boarded, and where Mr. Streator, Mr. Chamberlin and others who were active in building the road made their home when they were at Black River.

It seems that Mr. Reid saw all this work being done, knew of the surveys being made, saw the tracks put down, as the work progressed from day to day; that he also conversed with these engineers about it, and also with Mr. Streator, and that while this was being done he said on a number of occasions to Mr Streator, "Take all the land you want." So that while the quantity of land to be used for tracks and switches was to some extent uncertain and indefinite and dependent upon the future, yet within the time provided in the contract, there was a practical selection and appropriation by the party of the second part, of the lands to be used for the main track and switches, and that that comprised practically what is set forth in the plaintiff's petition.

There does not appear in evidence any objection on the part of Conrad Reid, to the prosecution of this work, to the expenditure of the

money, and the location of these various tracks, and switches as shown, with the single exception that when the company was proceeding to lay the track on the four acres, where his hotel stood, he objected, and upon consultation with Mr. Chamberlain, the latter assured him that all would be made right, and the work was completed.

On the 12th day of December, 1871, Conrad Reid and Katy Reid, his wife, executed and delivered to E. B. Thomas, et al., a warranty deed for the one undivided half part in common of the whole of lot four in great lot number one, excepting the four acres where the Reid House stood, and also certain minor tracts before that time conveyed to Edison, Tilden and Swartwood.

This deed was recorded on the 19th of December, 1872. The deed was made pursuant to the contract granting the undivided half of the tract.

On the 21st day of March, 1873, Conrad Reid executed and delivered a lease to Robert B. Dennis, one of the parties to the original contract. In this lease Reid granted to Dennis all the interest which he had, or ought to have in the premises situated in lot four in great lot number one, and the description is substantially the same as that contained in the deed.

It provided for a rent of six hundred dollars per annum to be paid in quarterly installments, and also all taxes, and it was provided that all permanent improvements, such as ware-houses, wharves, docks, slips, etc., and all buildings erected on these premises for any purpose, and all other improvements attached to the same, shall, upon the expiration of the lease revert to and vest in the party of the first part in proportion to his interest in the land therein described, to be held in common by him or his assigns with the other owners of the premises, but all railroad tracks or ties laid upon said premises were not to be included in the improvements, and were expressly excluded. This lease was to run ten years. And thereafter the party of the second part and his assigns paid the rental as stipulated.

This lease expired in 1883, and in the meantime, Conrad Reid the ancestor, died, and his property and estate including these premises descended to his sons, James, C. C. and George C. Reid; and at this time a new lease was accordinlgy made by and between the railroad company and these three sons.

This lease was to continue for the term of twenty years, and the premises described in it, were somewhat different from the description in the first lease in this, to-wit: all interest which the said first parties have or ought to have in the following premises, being an undivided half interest thereof; situated in lot four in great lot one, bounded and described as follows: Northerly by the highway, known as the Lake Shore Road, easterly by the meanderings of the Black River at low water mark, southerly by land owned by S. O. Edison and Philo Tilden, and westerly by the easterly line of the railroad of party of the second part made and conducted across said premises by a railroad company known as the Elyria Black River R. R. Company.

This lease provided a different rental from the former one. It was agreed that the premises should be appraised by a board of three persons to be selected, and upon that appraisal or valuation the railroad company was to pay a rental equal to four per centum of such valuation, to be paid in quarterly installments as before. And the land was to be appraised every five years thereafter in the same manner, and the judgment or award of any of these appraisers was to determine the amount that should bind the parties.

This lease was duly recorded in the records. It appears that the

property was appraised at that time, and it shows that it had greatly increased in value, so that the rental at the rate stipulated, amounted to about twelve hundred dollars per annum, and shows that the property was appraised at about thirty thousand dollars.

There does not appear to have been any controversy between the parties at this time, or any objection as to the amount of this appraisal, or any dispute as to the interest or estate or boundaries of the land to be appraised.

This rental was paid in that manner, until about 1887, when, according to the lease, a new appraisal was to be made, but it was deferred for a short time by mutual consent.

But on or about the 1st of July, 1888, John H. Farley, D. J. Nye and E. S. Flint were selected as arbitrators or appraisers, with a view of fixing the rental.

These parties met for that purpose, and it seems that the interested parties were also present; and at that time, two of the appraisers, to-wit, Farley and Flint, appraised the undivided half interest of the lessors at $67,500, upon which 4 per cent. was to be paid as the rental. D. J. Nye, however, did not sign this award, claiming that the amount was excessive.

The C. L. & W. R. R. Co. refused to abide by this award, and to pay the money, and suit was accordinlgy brought July 23, 1889, in Cuyahoga common pleas against the railroad company.

The petition contains five or six causes of action, being for the several installments as they fell due, and which were unpaid.

Issue was taken upon this award by the defendant in that case on the ground that it was obviously fraudulent, and the result of prejudice and passion on the part of one of the appraisers, to-wit: John H. Farley.

This case was tried in the common pleas court of Cuyahoga county, and judgment rendered for the full amount due according to the findings of the appraisers.

On the 2nd of July, 1895, the parties again met at Lorain to appraise this property, but nothing was done at this time, in as much as the attorney representing the railroad company, and counsel for the lessors when they came together, found that they could not agree as to the property to be appraised; counsel for the lessors contending that the valuation should cover the one undivided half of the property described; counsel for the R. R. Company contending that the tract of land covered by the railroad tracks and described in the petition, amounting to about twelve acres, I think, should not be taken into account in fixing the valuation, for the reason that the lessees possessed an easement or right of way in that property under contract with the ancestor of the grantors.

Nothing was therefore done at that time, and this suit was thereupon brought in this court to determine this disputed question touching the rights and interests of these respective parties.

The first question therefore, presented to the court, in the order of time, as well as importance, is the effect, if any, which is to be given by the court to this original contract by and between Conrad Reid, and Thomas et al., of May 30, 1871.

It is claimed, however, that there is no proof of the existence of this contract, the original being lost, and no testimony to show that Reid signed it; that the record offered in evidence showing that it was recorded August 3, 1883, in Record No. 3, pages 87, 88 and 89, of the Miscellaneous Record of the county, is not legal or proper evidence of the execution of the contract, the objection being that the recording acts, secs. 4006 and others of the R. S. do not authorize the recording of such a contract.

It is claimed on the other hand, that at the time this contract was drawn and signed, there was no law in force requiring it to be recorded; but that in 1875, the general assembly of this state provided for the recording of contracts of that description, sec. 3322, R. S.; Ohio Laws Vol. 72, page 76.

Now, I am of the opinion that that section covers this contract, and that it was properly recorded by the recorder thereunder, and under that section a copy duly certified by the recorder is to be received in evidence in all courts and places in the same manner and to the same effect as the original.

It is further objected that it was not recorded in the book of leases, and in fact it was not; but it was recorded in a public record entitled "Miscellaneous Records," a record kept in the recorder's office. And the fact that the recorder recorded it by mistake, possibly, in a volume entitled 'Miscellaneous Records," instead of the volume of leases, ought not to have the effect of excluding it from consideration as evidence in this case; and I feel the more warranted in this conclusion from the fact that in the lease of 1883, by and between the railroad company and the present defendants, there is a memorandum on the back of the lease signed by S. Chamberlain, for the Railroad Company, to the effect that it was understood and admitted by the Railroad Company that said company had not an undivided half interest in the part of land therein leased that may be included in the four acres attached to the Reid House. reserved by Conrad Reid, in his contract and deed to E. B. Thomas, J. W. Tyler and Robert B. Dennis, and under that memorandum appears the acknowledgment of George C. Reid and wife, by their attorney un fact, Henry E. Mussey.

It is apparent to the court that that memorandum was there at the time this acknowledgment was taken.

But whether this notice of the existence of this contract to the agent, is constructive notice to his principal or not, I have concluded to take the evidence offered by the record, as evidence of the execution of that contract by Conrad Reid in 1871.

The provision in Sec. 3322, that such lease should be recorded in the book of leases, I consider as directory to the recorder.

In the case of Smith, Ex'r v. Alexander M. Smith et al., 13 Ohio St., the Supreme Court of this state held that a mortgage by the mistake of the recorder, recorded in the Volume of Deeds, was notice to a subsequent purchaser for value, without actual notice or knowledge of said mortgage.

The execution of the contract being proved or admitted, the effect to be given thereto does not in any manner depend upon its being recorded. As between the ancestor, Conrad Reid, and the plaintiff in this suit, it was not necessary that it should be recorded. A contract for the sale of land or an agreement for an interest in lands, as between the original parties thereto, is effectual without record. In such case, equity regards that as done which ought to be done, and where an agreement of that kind is made, a court proceeding upon principles of equity will carry it into effect according to the intention of the parties.

In this case the defendants as the heirs of Conrad Reid stand in the shoes of their ancestor, and took the estate subject to whatever rights or interests were created therein by their ancestor, unless the trust deed given by one of these brother to Major George C. Reid, some time in 1849, is to have the effect of making him an innocent purchaser, which I think, is not the case, and by that deed he was made trustee for one of the other defendants and joint tenants merely to carry out an arrangement between them, and to protect certain interests.

It is true that Major Reid has made certain advancements upon the

faith of the trust estate, but still the property must be regarded, we think, as the property of the cestui que trust.

A further objection of the consideration of this original contract is, that the rights and interests conferred thereby, merged in the deed given by Conrad Reid and wife on the 12th day of December, 1871.

And this raises the question whether the principle contended for applies to the facts of this case.

The case of Cliffton v. The Jackson Iron Co. 74 Mich. Rep. 183, is a leading case regarding the doctrine of merger, and is relied upon by counsel for the defendant here.

In that case, the owner of land, on contracting for its sale, reserved the timber with the right of removal for a specified time, and conveyed the land to the vendee before the expiration of the time so limited by warranty deed, without any such reservation. The timber passed to the grantee. In that case the court held that the contract merged in the deed, but even in that case, the court held that after such deed, there might be such dealings as to render such timber-cutting lawful by license, express or implied.

And in Seager v. Cooley, 44 Mich. Rep. 15, the court held: "Where a deed is given, in pursuance of a land contract, it is presumed to secure and perpetuate all rights conferred by the contract, and an intermediate conflicting deed given by the same grantor has no priority." And further "Immediate possession and constant occupancy by one who holds under a land contract, operate as full notice of his rights under the contract, so far, at least, as concerns inclosed premises."

"Merger is not an equity doctrine. A leading feature of that law is that merger will never be presumed against the equities of the parties. To work a merger which shall have such effect, there must be an unequivocal act of the party to be injuriously affected by it, absolutely and irrevocably establishing the right to be merged." Corwin et al. v. Collett's Exrs. 10 Ohio St. 294.

Now in this case, the land conveyed by deed being an equal undivided half in common, and the further interests provided by the contract for a right of way or an easement over all the lands owned by the grantor, and when Conrad Reid executed and delivered his deed in December, 1871, he simply gave the fee simple title for the one undivided half of the property; he retained the title to the residue. It was not necessary therefore, that any mention should be made in the deed of the interests and privileges secured by the contract.

The defendants contend that this deed of December, being simply a conveyance of the fee, without any condition, provision or stipulation therein for an easement or right of way over any other lands, or interests of the grantor, that all such interests or rights of way lapsed by the delivery of this deed

And this, I suppose, is upon the principle that in this final conveyance, if anything more was intended than a deed for the title, that it should have been expressly set forth in the deed.

But it is the judgment of the court, that the interests, easements and rights of way claimed by the plaintiff in this case, covered other lands and interests than those conveyed by the deed; that it does not follow that the grantees, in any manner, waived their rights, or that their interests were merged in the acceptance of the deed.

This then brings before the court, as evidence, all these various contracts, namely, the original contract of May 30, 1871, the deed pursuant thereto, in December, 1871, the lease of 1873, and the lease of 1883, as well as the acts and proceedings of the parties in carrying out and executing these various contracts, in order to settle this dispute; whether the

tracts covered by the railroad tracks and specified in the petition, are to be excluded from a valuation of the premises upon which a rental is to be paid. Or, in other words, whether the title and easement of the plaintiff in and to these lands is to be quieted.

The contract of May 30th, 1871, is indefinite as to the amount of land to be taken by the railroad company, and also as to the time within which the land was to be taken for the rights of way, switches and tracks.

On the one side it is claimed that whatever lands were appropriated or taken by the plaintiff for its tracks, switches and depot ground was to be owned in common, each owning an undivided half.

On the other hand, the railroad company claims that whatever land was necessarily and properly taken for railroad tracks, main track and necessary switches, became a permanent easement, and that such easement was in addition to the title conveyed for an undivided half.

In construing this contract and applying it to its subject matter, certain well known rules of construction must be regarded. The authorities upon this point are very numerous, and for the purposes of this case it is perhaps sufficient to refer to the rule laid down by Judge Swan in his Treaties, page 522, "Contracts are to be construed according to the general intent appearing from the language used in them. The language used by a party must be construed as he supposed the other party would understand it, or as the other party had a right to understand it. Where the language of a contract is plain and unequivocal, there is no room for construction; and the contract itself is better and safer evidence of what the parties intended, than any allegations of misapprehension, or verbal evidence of an intention different from the plain meaning of the contract. Every contract is to be construed with reference to its object and the whole of its terms and accordingly the whole context must be considered in endeavoring to collect the intention of the parties, even although the immediate object of the inquiry be the meannig of a doubtful isolated clause."

Applying these rules therefore, what is the fact? Here was the beginning of a railroad, and in fact, the beginning of a flourishing town, for Lorain has since that day become a flourishing manufacturing city of some ten or twelve thousand inhabitants. These parties were looking into the future; they were looking forward on one hand to a railway terminal involving main tracks, sidings, switches and docks along the river.

And on the other hand, Mr. Reid was looking forward to the benefit and increased value of his lands by reason of the growth and prosperity of the place.

It was mansifestly impossible at that time, to locate accurately and specify by metes and bounds, the land to be used for the purposes of this railway system.

It may therefore, I think, be considered that both parties intended that the railway company should have the right of an easement for its main line over his lands, and for such switches on other portions of his lands as were reasonable and proper at that place for the business to be carried on, and I think both of these parties must have contemplated that this would be done.

But if there were any doubt upon this point, I think it has been fully cleared up and made plain by what was actually done by the parties themselves, showing, I think, very clearly what they intended. The company at once surveyed and located its main line over Reid's land which are indicated as follows on the plat offered in evidence, to-wit: From A to B, then from C. to H, from H. to D, and then along the river margin from D to J and from J to E, and from G to K, and then what was called the grove tracks. These surveys were all made and tracks put

down within the time specified in the contract, and with full knowledge and apporval of the grantor. Had there been any objection to this, or any undue or improper extension of the right of way, I think the grantor would have then and there protested. In fact he did protest to the work on the hotel lot, namely, the four acre tract, which was expressly reserved. But in respect to all the other rights and the actual location and work thereon of these tracks, the evidence discloses no objection or protest whatever. Mr. Streator says in his deposition that Mr. Reid, in watching the progress of this work, upon these very lands, said to him a number of times "Go on, take all the land you want."

Now, by these proceedings and conduct of the parties, I think it may be taken that their intention was clear.

If Mr. Reid were in full life and here in court to make this claim which these defendants are contending for, the answer might well be made, "why was the objection not made when you saw that the grantees in the contract were exceeding the rights which you intended to confer?" And where a party stands back and sees a work of that kind prosecuted, and money laid out and expended, on the faith of a right claimed to exist, the principle of equitable estoppel will most naturally apply.

In the case of Goodin v. Cin. & Whitewater Canal Co. et al., 18th Ohio St., 169, the court held:

"The owner of land who stands by, without objection, and sees a public railroad constructed over it, cannot, after the road is completed, or large expenditures have been made thereon upon the faith of his apparent acquiescence, reclaim the land, or enjoin its use by the railroad company. In such case there can only remain to the owner a right of compensation."

It cannot be claimed, I think, that the plaintiff had the right under that contract to appropriate and lay tracks at pleasure, thus covering the whole and every inch of land owned by the grantor as was suggested in argument.

The case of Railway Co. v. Williams, 58 Ohio St., 268, is in point. That was a grant of a right of way for a railway company. The agreement was for a strip of land sixty feet wide through the owner's entire property on such route as said company has located its road. As in this case, "there was not attempt to describe the exact land," and Spear, J., says, "the land actually occupied by the company in the construction of its road and the action of the parties in regard thereto became of prime importance in determining what land the owner intended to part with, and the company intended to buy."

In this case the land actually taken deviated to some extent from the surveyed line, but he, nevertheless, accepted from the company the compensation.

And the rule is laid down that "where an easement in land is granted in general terms without giving definite location, and description to it, so that the part of the land, over which the right is to be exercised, cannot be definitely ascerained, the grantee does not thereby acquire a right to use the servient estate without limitation as to the place or mode in which the easement is to be enjoyed. When the right granted has been once exercised in a fixed and definite course with the full acquiescence and consent of both parties, it cannot be changed at the pleasure of the grantee."

Again, "where the terms of a grant of right of way are general and indefinite, its location and use by the grantee, acquiesced in by the grantor, will have the same legal effect as if it had been fully described in the terms of the grant."

I hold that it was the duty of the grantee, the railway company,

within a reasonble time after that contract was made, to mark out a designation for the construction and operation of its railway tracks, its right of way, switches, etc., and that the railway company having complied with the terms of the contract on its part, and having appropriated and taken these several tracts of land for its railway tracks and switches, with the full knowledge and approval of Conrad Reid, that the rights of the company in and to that property by way of easement, became fixed and determined.

The testimony of witnesses, (I am speaking now of the surveyors and engineers who laid out these lines) is, that no more land was taken or appropriated for this purpose than was reasonably and properly necessary for the business of the road. And as to the time, the testimony is also uncontradicted that all this was done by the year 1874, and within the time fixed by the contract. I do not deem it necessary in this case to go into the matter of the area or the width of these various strips or parcels —certainly it means more than a mere strip of land sufficiently wide to take in the railroad ties.

There are numercus authorities to the effect that the grant of a right of way, for a railroad includes so much as is necessary to maintain slopes of embankments and cuts, ditches, fences, telegraph poles; but in this case the testimony is uncontradicted, that so much land was taken for these various lines as was necessary for the operation of the road, and with a fair estimate of the business to be done upon it, I do not think the court would be warranted in saying that the railroad company exceeded its rights in the location of these tracks and in the land taken therefor, when the evidence wholly fails to disclose any objection whatever on the part of the owner to the actual taking and appropriation of the land for that very purpose.

In answer to this construction of the contract and the actual location and laying of these tracks, it is said that the lease that was subsequently made by Reid, to-wit, the lease of 1873, is at variance with this claim. The inquiry naturally arises, if the railway company has a deed for the undivided half and a written contract to construct and maintain tracks upon any portion of the land and over these lands of the grantor, what was the necessity for a lease for the period of ten years.

The language of that lease, in regard to the interest leased, is not conclusive; in fact it does not intend to convey any undivided half interest in common to the lessees, but it is only for such interest as the grantor had in the whole of the premises, and in one sense the lease might be construed as an admission that his claim was the one undivided half, less the easement carved out of it for the railroad tracks. The lease, however, shows that it was intended to cover other things that the mere matter of railroad tracks and switches. The railroad company was to have the right to cut ditches, drain lands, build docks, warehouses and other betterments of the premises, with the provision that all such betterments at the end of the lease should revert to the grantor to the extent of his interest, expressly reserving, however, from that clause the railroad tracks and ties. And it is claimed that by making this lease, and agreeing to pay the rent provided for in it, for ten years, without any claim under a pre-existing contract, that the plaintiff is estopped from now setting up its rights under that contract.

And again, it is claimed that at the termination of this lease, to-wit: 1883, after the death of the grantor, and after these defendants had succeeded, by inheritance, to all the rights and estate of the grantor, that a new lease was made for twenty years, which the railroad company accepted, and in that lease the interest was specifically defined as being not only the interest of the grantees in the whole of that land, but being the undi-

vided half thereof; and it is insisted that the railroad company having accepted that lease thus defining the interest, that the plaintiff is estopped to make any claim of the rights conferred by the original contract, especially as it is claimed that the railroad company paid the rental provided for, for a number of years after the execution of that lease.

Now, the question arises, by accepting this lease, and paying the rent, has the plaintiff made such an admission or so acted as to create an estoppel?

The object and purpose of making this lease is very apparent. Conrad Reid had died in the meantime. The lease expired in 1883, and doubtless the extension was to renew the lease for a period of twenty years, and to provide a new rule to determine the amount of rental to be paid, and certainly this lease made by the grantors, defendants in this action, and accepted by the plaintiff in this suit, cannot be regarded as an estoppel by deed, for it is not the deed or grant of the plaintiffs in this suit. An estoppel by deed is said to exist where a party makes a deed, and the deed so made contains recitals or statements; in such case a party is said to be estopped by deed, and the principle of an equitable estoppel, or, in other words, an estoppel in pais is applicable to this case. In its most common aspect this estoppel is founded upon deceit, and has its jurisdiction in the duty of the courts to prevent the accomplishment of fraud. The estoppel consists in holding for truth a representation acted upon, when the person who made it, or his privies, seek to deny its truth and deprive the party who acted upon it from the benefits obtained.

It is a rule of equity that if a representation be made to another who deals upon the faith of it, the former must make the representation good, if he knew or was bound to know it to be false.

Where the representation is of a trifling or immaterial thing, or the party alleging it did not in fact trust in it or was misled by it, in such cases equity would not interfere. It must appear that it would have been a matter of substance or importance to the interests of the other party, and that it has actually misled him. To constitute an estopple in equity, it must appear that one has made some representation or statement or performed some act thereby misleading another to his prejudice and damage.

There are numerous cases to the effect that to work an estoppel there must be prejudice to the party claiming it, and also fraud or bad faith, or their equivalent, gross negligence in the party to be estopped.

I do not find, in the facts relating to the acceptance of this lease and the payment of the rent therein provided for, anything by which the defendants in this case were misled or prejudiced, or that by reason thereof they have in any manner changed their situation or condition with reference to this property. It is apparent, from the reading of the leases, that it was intended to take the place of the lease that had expired. It uses the language of the old lease, namely: "All the interests of the grantors in and to that property," but adds thereto, "being the one undivided half thereof." It may be said if this lease was to have the effect of a recital binding the parties absolutely, that it might well have said, in describing the property, "being the one undivided half," and saying nothing about all the interest of the grantors in and to that lot.

However, I cannot find that there is anything in this lease, or in its acceptance by the grantees, or in the payment of the rent thereunder from time to time, to work an estoppel. I cannot find in this such conduct as to prevent the plaintiff in this suit from claiming whatever rights it originally acquired from the original owner of this property, Conrad Reid. And as a matter of equity, if that contract secured to the plaintiff the right of way over these lands contended for, and the location of that right

of way was acquiesced in and encouraged by the original grantor and owner of the land, pursuant to the terms of that contract, the court should be reasonably clear in finding that the plaintiff, by making this last lease, intended to and did thereby abandon all the rights and interests they had acquired by their contract.

An estoppel should not be applied or extended by implication or intendment.

When this renewal lease was made in 1883, all these parties were well informed as to the locus in quo; they knew that these tracks, every one of them, were upon the ground, and the railroad in full operation; they knew, also, that all this work had been done and money laid out by the plaintiff during the lifetime of their ancestor; they knew that the plaintiff was in actual possession of all of these parcels.

Possession is one kind of title, and where a party is in possession of lands or tenements, claiming title, it is notice to all the world. And I do not see how, under the circumstances, it can be claimed by these defendants, some of whom still reside in the town of Lorain, to be ignorant of these facts, or how it can be claimed that they have been in any wise misled or prejudiced by reason of the statement or recital in their own lease made in 1883.

There is one further question in this case. It is claimed that in July, 1889, these defendants commenced a suit in the court of common pleas of Cuyahoga county, to recover money, being the rent due them from plaintiff in this case, under the stipulations of the lease of 1883, and that the defendant in that action, the plaintiff in this, filed an answer in that cause; and that the questions involved in this action are identically the same as those involved in the court of common pleas of Cuyahoga county, in the case above stated.

It is claimed that a trial was had in that court, and that a judgment was entered in behalf of the plaintiff therein, to-wit, the defendants in this case.

This makes the point: are the questions involved in this action res adjudicata?

The entire record in that action has been submitted to the court. It appears from the petition and pleadings that is was a money action, based upon an award alleged to have been made pursuant to the terms of a lease entered into in 1883. In the answer in that action the defendant, the railroad company, denied the indebtedness, and alleged the award was fraudulent; that the amount awarded was so grossly unjust and disproportionate to the true value of the property as to constitute a fraud. Now, this was the issue in that action.

It is claimed that in the trial of that cause, evidence was offered of the value of the one undivided half of the premises, which the appraisers had to value, and that the verdict in favor of the plaintiff settled the appraisal of these premises as a proper appraisal of the premises in the lease; that it would have been competent and proper for the defendant railroad company in that action, to aver that the premises appraised by the three arbitrators covered several large tracts of ground not included in the lease, and that therefore the appraisal was excessive. And it is insisted upon this point, that a party defending is bound to set up all matters which are strictly matters of defense, and if he omit so to do, he cannot afterwards relitigate these matters in a new action.

It does not appear from the pleadings that any defense was made touching the construction of the contracts, and as to the extent of the interest by metes and bounds.

The main question was that the award was fraudulent. And the case turned upon that issue, and the jury in that case finding against the defendant, the court rendered a judgment.

It is difficult to see how, in that action, the defendant could go back of the award made, unless the award itself was first impeached.    It is difficult to see how the court in that action could determine the question of what property the arbitrators actually valued.    That involved the consideration of all the contracts and of all the facts that have been brought in the case.

To make the defense of former adjudication available, it must be made to appear that the subject-matter of the action, and that the parties are the same.

The case of Porter v. Wagoner, 36 Ohio St., 471, is in point.    In this case a former adjudication was set up as a defense, and in reference to that defense, Judge White uses the following language:

"The question is not what the court might have decided in the former action, but what the court did, in fact, decide, as shown by the record."

The case of Lessees of Loree et al. v. Truman, 10 Ohio St., 45, was decided by Peck, J., and in his decision the learned judge referred to and commented upon numerous decisions upon this point.

It was in a case where a former adjudication was relied upon, and it was held in this case that, "where a judgment or decree is relied on by way of evidence, as conclusive per se, between the parties in a subsequent suit, it must appear by the record of the former suit, that the particular controversy sought to be precluded was therein necessarily tried and determined."

Now the questions involved in this suit by no means necessarily arose in that suit.    The defendant there simply attacked the award upon which the suit was brought, and upon which judgment was claimed for fraud and misconduct on the part of the arbitrators.    That was the only question made in the pleadings, and the only question necessarily involved in the suit, and the defendant, having failed there as appears by the record, to establish its contention of fraud, a judgment was rendered on the award for the amount claimed.

An examination of the record of the cause fails to show that the particular controversy involved here was at issue and determined in that action.

It is claimed that the appraisement or award upon which that suit was brought was based upon the lease, and that lease, in express terms, excludes the main track, and also all the four acres.    The bill in this case includes both of these items.

My judgment upon this matter is, that the entire controversy submitted to the court and jury on the trial before, related to the bona fides of that award.    The case presented here, and upon which issue is taken, was not tried or decided in the former adjudication, and that the judgment rendered in that case cannot be considered as a bar to this action.

It is insisted also in the argument of this case, that the court ought not to grant the relief prayed for, for the reason that the case of the plaintiff comes within the rule regarding a stale equity: that the plaintiff has for many years slept upon its rights, and that it now comes into court at the eleventh hour and makes a claim never made before, and for this reason the relief prayed for should be denied by the court.

In the language of Judge Johnson, in the case of Paschall v. Hinderer, 28 Ohio St., 576:

"What constitutes a stale equity is a vexed question hardly susceptible of an accurate definition.    Length of time alone is not a test of staleness. Stale equities will not be enforced; when a party, having an equity, fails to enforce it for a period which would constitute a bar at law, under the statute of limitations—in analogy to the statute—it will also be barred in equity."

And the rule is laid down in many cases that where a party has slept upon his rights or acquiesced for a great length of time, he will not be aided by a court of equity.

But is this a case of that description? Is this a stale equity in the eye of the law?

This contract under which these rights are claimed was made in 1871. The parties to that contract undertook to execute it in so far as it furnished the consideration therefor on one hand and the donation or giving of the lands for the purposes of a railroad upon the other. Possession was taken of these lands under that contract, before 1874, and from that day to this the plaintiff in this suit has been in the possession of these several tracts of land. using the same openly, exclusively for the purposes of their railway, and this has been done all this time, without objection from any source whatever, and the only question there is in this case now relates to what might be called the undivided half of that property, in connection with the easements and rights of way granted in the remaining undivided half.

A number of appraisements of this property have taken place, but how the property was appraised, what was taken into consideration, or otherwise, does not appear. It does appear that in 1895, when the parties met pursuant to the terms of the lease to make a new appraisement of this property, they disagreed totally as to the basis upon which the appraisement was to be made, one party claiming one thing, and the other another thing, and to settle this dispute, about which these parties honestly differ, this action has been brought.

Under these circumstances, the party ought not to be turned out of court without a hearing, for the reason that the rights claimed are so ancient and remote as to be denominated stale in law.

The court has not undertaken to decide, and does not decide, the question suggested in the brief of one of the counsel, namely, the question as to the quantity of land that may be taken, and the time within which the right must be exercised under the contract. It does not follow, from what has been declared, that as the city of Lorain increases in population and business, and increased railroad facilities are required, that the railroad can go on, year after year, appropriating land under this contract, for tracks and switches, until the grantor's entire property is covered, leaving him a bare legal right, without any beneficial use. So far as the particular parcels of land described in the petition are concerned, the relief asked for is granted under the contract entered into and by reason of the practical location of the lines and tracks, while the road was in process of construction, and within a reasonable time thereafter, and with the full knowledge and approval of the parties who were then present, upon the principle laid down in the case of Goodin v. Cin. & Whitewater Canal Co., 18 Ohio St., 169, above quoted.

It is the judgment of the court, therefore, that a decree may be taken in this case, quieting the title of the plaintiff to an easement and right of way for their railroad tracks and switches in and over the land in the petition described, and that the costs of this action shall be divided equally between the plaintiff and the defendants.

Judge Ingersoll, P. H. Boynton and A. R. Webber, for defendants, the Reid heirs.

J. M. Lessick and E. G. Johnson, for plaintiff, The C., L. & W. Ry. Co.